UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMES ARNOLD LEWIS,

                Plaintiff,

v.                                           Case No. 21-cv-232-pp

ANN YORK, *et al.*,

                Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 33) AND DISMISSING CASE**

---

Plaintiff James Arnold Lewis, who is incarcerated at Kettle Moraine Correctional Institution and is representing himself, filed this case alleging that the defendants violated his constitutional rights. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim based on allegations that the plaintiff has a compromised immune system, the defendants failed to move him from his cell or give him cleaning supplies after being informed that his cellmate had tested positive for COVID-19 and the plaintiff refused to eat or drink until he was moved from the cell two days later. Dkt. No. 7 at 8, 10. The defendants have filed a motion for summary judgment. Dkt. No. 33. The court will grant the defendants' motion and dismiss this case.

1. **Facts**[1]

    A. <u>Parties</u>

The plaintiff was incarcerated at Waupun Correctional Institution during the events described in the complaint. Dkt. No. 34 at ¶1. During that time,

---

[1] The court includes only material, properly supported facts in this section. <u>See</u> Fed. R. Civ. P. 56(c).

1

defendant Joseph Falke was the security director at Waupun, id. at ¶2; defendant Robert Weinman was the nursing supervisor/health service unit manager (HSM) at Waupun, id. at ¶3; defendant Lori Alsum was employed by the Wisconsin Department of Corrections' (DOC) Bureau of Health Services (BHS) as a nursing coordinator, id. at ¶4; defendant Randall Hepp was the warden at Waupun, id. at ¶5; and defendant Ann York was a nurse clinician II at Waupun, id. at ¶6.

B.  Waupun's Response to the COVID-19 Pandemic

Waupun is a maximum-security prison with the capacity to hold 962 incarcerated persons at one time. Id. at ¶19. In October 2020, Waupun housed about 1,150 incarcerated individuals in four housing units and a restrictive housing unit (RHU). Id. at ¶20. Of the four housing units, one has approximately 239 cells, another has 207 cells and two have 199 cells each. Id. at ¶21. Most of the cells are set up as shared cells. Id. The RHU has 180 single-occupancy cells. Id.

The COVID-19 pandemic created numerous unique challenges as Waupun worked, and continues to work, to keep incarcerated individuals and staff safe while maintaining normal operations. Id. at ¶22. While there was, and is, no foolproof way to prevent COVID-19 from entering and/or spreading within the institution, Waupun adapted and updated its practices as more information and guidelines were provided and as circumstances within the institution changed. Id.

Defendant Hepp and the rest of the institution's leadership relied on the Health Services Unit (HSU) and BHS to develop policies and practices at the institution to mitigate the risks associated with COVID-19. Id. at ¶23. Throughout the pandemic, Warden Hepp communicated regularly with the

HSU manager to receive information and guidance from BHS regarding how to respond to COVID-19. Id. Defendant York was not part of the pandemic planning process at Waupun. Id. at ¶24. All directives about how to navigate COVID-19 at Waupun came to her from the HSU manager and other leadership staff. Id

Since the pandemic began in March 2020, Waupun has implemented a variety of practices to help slow the spread of COVID-19. Id. at ¶26. For example, Waupun recommended incarcerated individuals and staff wash their hands regularly with soap and water for at least twenty seconds; avoid touching their eyes, nose and mouth; cover coughs or sneezes; keep living and work areas clean; wear a mask (for incarcerated persons, even while in their cell with a cellmate as much as possible); and maintain social distancing whenever possible in order to slow the spread of the virus. Id. Waupun developed practices to the best of the institution's ability considering the physical layout and design of the facility and the institution's operational and security needs. Id.

In 2020, Waupun relied on isolating and quarantining incarcerated individuals to slow the spread of COVID-19. Id. at ¶27. Isolation status generally refers to an individual with a test-confirmed case of COVID-19, while quarantine status was broader and included, for example, persons who may have been exposed to COVID-19, those who exhibited symptoms but had not yet returned a positive test and individuals who had recently transferred to the institution. Id.

Prior to October 2020, preliminary discussions and planning had been held that considered the possibility of reserving one wing of the RHU complex for use as isolation cells. Id. at ¶28. The capacity of that wing is sixty. Id. But

3

this was not possible even during the early stages of Covid-19. Id. The initial results from testing conducted the week of May 26, 2020 indicated that 184 individuals were positive for COVID-19, which was more than Waupun could individually isolate in the RHU wing. Id. Due to the lack of space, Waupun could not empty the RHU to create isolation cells. Id.

Waupun did not have movement between housing units. Id. at ¶29. When possible, Waupun avoided transferring an incarcerated individual from one cell hall to another in an attempt to mitigate the spread of COVID-19. Id. Institutional operations and movement were modified based on testing results. Id. at ¶30. For example, meals, canteen, medication, insulin and accu-checks were at times delivered to cell fronts for incarcerated individuals on both quarantine and isolation. Id. Phone calls, school/programs and mail and property delivery were altered or at times suspended to mitigate the spread of the virus. Id.

Other protocols at Waupun included suspending in-person visits; suspending volunteers from entering the institution; having cleaning crews clean and sanitize all areas of the institution daily, especially all "high touch" surfaces; limiting all non-essential movement within the institution; suspending recreation; having persons shower in small groups from the same housing unit; sanitizing showers between uses; sanitizing phones between uses; providing individuals with additional bars of soap and cleaning supplies weekly; installing hand sanitizer stations throughout housing units and common areas; temperature checking individuals prior to leaving housing units; and having HSU staff complete rounds offering temperature/symptom checks at cell fronts for all persons willing to engage with the service. Id. at ¶31. The recreation schedule was modified and at times completely suspended.

4

Id. Waupun separated recreation periods by housing unit to prevent cross-unit contact among individuals and reduced the recreation period size and the frequency of attendance each week. Id.

When vaccines became available, the DOC requested doses of vaccine for each facility to administer the following week. Id. at ¶32. The HSU was responsible for working with incarcerated persons to facilitate vaccinations. Id.

Staff were required to wear face masks; maintain six feet social distance, when possible; participate in entrance screenings upon the start of each shift; sanitize their work areas; wash and sanitize hands frequently; report any COVID-19 symptoms immediately; and stay home if they were feeling ill. Id. at ¶33.

C. Events of October 2020

On September 22, 2020, the plaintiff was taken to the segregation building and placed on temporary lock-up (TLU) status pending an investigation. Dkt. No. 46 at ¶31.

On October 13, 2020, Warden Hepp sent memoranda to the incarcerated individual populations and staff regarding the need to modify activities at Waupun due to a recent increase in COVID-19 cases and notifying them of upcoming testing. Dkt. No. 34 at ¶35. The memo stated:

> Unfortunately, last week we identified three positive cases of [COVID-19] among the population. By Friday that number was nine and this morning it was thirteen. The number of individuals in quarantine status has also risen significantly. Beginning on Wednesday and continuing next week we will be collecting samples for testing at the institution to identify any unknown positive cases.
>
> This will allow us to determine the best ways to limit potential spread of the disease and to ensure health care for those who need it.

Dkt. No. 46 at ¶¶32-33.

On October 14, 2020, the plaintiff was moved from TLU status back to the general population where he shared a cell in the northwest cell hall with an individual named Mekious Bullock. Id. at ¶34. The Wisconsin National Guard (WING) conducted mass Covid-19 testing at Waupun on October 20, 2020 and October 23, 2020. Dkt. No. 34 at ¶36. The results of this event showed 431 incarcerated persons had tested positive for COVID-19. Id. The number of positive incarcerated persons from this WING testing event was more than Waupun could individually isolate. Id. at ¶37. In addition, negative incarcerated individuals had been living with positive individuals in the days between testing and receiving test results back. Id. Waupun was unable to move negative incarcerated persons and cell them together because they could have been exposed to the virus already. Id. Waupun also had to consider the possibility that any given individual may have falsely tested negative due to the limited accuracy of the tests. Id. In response to these positive cases, Waupun continued the modified operations and had WING come back to re-test staff and incarcerated persons on November 12 and November 13, 2020. Id. at ¶38.

The parties dispute whether the plaintiff tested positive for COVID-19 during the October 2020 WING testing event.[2] According to the defendants, on October 20, 2020, the plaintiff tested positive. Id. at ¶¶39, 44. According to the plaintiff, on October 24, 2020, Waupun staff gave him the positive test results of another James Lewis who was incarcerated at Waupun. Dkt. No. 45 at ¶39. The plaintiff states that in November, he received notification that he had tested negative from the October 2020 COVID-19 testing. Id. The plaintiff states that while he has received multiple notices that the other James Lewis

---

[2] The defendants acknowledge that there is a factual dispute regarding whether the plaintiff tested positive for COVID-19. Dkt. No. 50 at 2.

6

tested positive, the plaintiff never has received notification that he, James Arnold Lewis, tested positive for COVID-19. Id.

On October 25, 2020, defendant Nurse York came to the plaintiff's cell and informed the plaintiff's cellmate, Mr. Bullock, that Bullock had tested positive for COVID-19 from the test taken on October 20, 2020. Dkt. No. 46 at ¶¶24-25. The plaintiff told defendant York that either he or Bullock had to be taken from the cell because the plaintiff has "underlying conditions."[3] Id. at ¶26. York said that no one would be moved because the plaintiff had already been exposed so he would have to "just deal with it." Id. at ¶27. The plaintiff asked York her name, "saying that if they failed to move him after he told them he had underlying conditions he was going to sue and name her as the first defendant." Id. at ¶28. York gave the plaintiff her name. Id. at ¶29. According to the plaintiff, he also asked York for disinfectant to clean the cell. Id. at ¶30. The plaintiff avers that York refused the plaintiff's request for disinfectant to clean his cell because he already had been exposed. Dkt. No. 1 at ¶18. York does not recall the plaintiff asking her for cleaning supplies but states that if he did ask, she would not have been able to provide him with cleaning supplies. Dkt. No. 51 at ¶30. She says she would have directed him to request supplies from the unit manager or other officers working in his housing unit. Id.

That same day (October 25, 2020), the plaintiff submitted two interview/information requests and one health service request. He wrote an interview/information request to the security director, defendant Falke, saying staff was refusing to move him even though he was in a cell with someone who had tested positive for COVID-19 and that he was being denied cleaning

---

[3] In the complaint, the plaintiff avers that he informed York that he had a compromised immune system because he does not have a spleen. Dkt. No. 1 at ¶18.

7

supplies. Dkt. No. 46 at ¶¶5, 23. The next day, Falke responded, "Information has been forwarded to proper staff. We will continue to monitor you to ensure safety." Id. at ¶7. The second interview/information request was to defendant Warden Hepp, in which the plaintiff stated, "I'm officially giving notice that I am on a hunger strike as of today. I'm in the cell with someone who tested positive for Covid-19 and they refuse to move me or give me cleaning supplies." Id. at ¶20. The plaintiff submitted a health service request in which he informed the HSU that he was on a hunger strike. Id. at ¶22. The response says that request was referred to the HSU manager and states, "Noted. Incident Report completed." Id. Defendant Weinman responded on October 29, 2020, and his response says, "Single cell." Id.

On October 26, 2020, the plaintiff submitted another health service request and two administrative complaints. He submitted the health service request to the HSU stating that he had his spleen removed "which means [he has] a compromised immune system." Dkt. No. 34 at ¶50. The plaintiff also stated that he "should not be in a cell with a COVID-19 positive inmate. HSU can make a medical decision to have me moved and I'm asking you to do so!" Id. The request was referred to Weinman and on October 29, 2020, he responded with "Done" because by that time, the plaintiff already had been moved to a single cell. Id.

In the first administrative complaint the plaintiff submitted (WCI-2020-18491), he complained that he was placed in a cell with a cellmate who subsequently tested positive for COVID-19. Dkt. No. 34 at ¶¶40-41. Hepp reviewed the complaint and on October 28, 2020, he signed off on the institution complaint examiner's recommendation to dismiss it. Id. at ¶42. The institution complaint examiner's response to the plaintiff's complaint advised

him that Waupun was following CDC and BHS recommendations in an effort to minimize the possibility of exposure for staff and incarcerated persons. Id. at ¶43. The plaintiff filed a second administrative complaint (WCI-2020-18937), in which he again complained that he was being celled with an incarcerated individual who had tested positive for COVID-19. Id. at ¶¶52-53. Hepp reviewed WCI-2020-18937 and, on November 23, 2020, signed off on the institution complaint examiner's rejection of the complaint as moot, in accordance with Wis. Admin. Code ch. DOC §310.10(6), because the plaintiff already had been "moved to a single cell on 10/27/2020." Id. at ¶54.

On October 27, 2020, Nurse Robert Ahlborg (not a defendant) was on the range checking with another patient when the plaintiff asked to speak to him. Id. at ¶45. Ahlborg charted the following notes from their exchange:

> Writer was on the range checking another patient when [the plaintiff] asked to speak to me. He reported that he is on a hunger strike because he is housed with a Covid positive cell inmate and he is at high risk. He reported that he had a splenectomy in the past. (Comment; due to traviuq), had hypertension, and decreased kidney function per EMR. He is not currently symptomatic and recently tested negative. He is seeking to be housed alone as the number Covid positive cases in his cell hall is extremely high. He reported that he was an LPU for 20 years and has a good understanding of viral transmission, treatment and risk factors. He reported that he has not eaten for 72 hours. [Ahlborg, Robert C – 10/27/2020 9:21 CDT])

Dkt. No. 46 at ¶42. In the complaint, the plaintiff avers that Ahlborg agreed that the plaintiff had a compromised immune system and told the plaintiff he would email his supervisor, Weinman, about the situation. Dkt. No. 1 at ¶29. Several hours after Ahlborg talked with the plaintiff, APNP Mary Moore (not a defendant) wrote an order for "single cell only" for the plaintiff. Dkt. No. 46 at ¶43. The reason given was an increased risk of infection. Id.; Dkt. No. 34 at ¶48. That same day, the plaintiff was moved to a single cell. Id. at ¶49.

9

On November 7, 2020, the plaintiff was seen by Nurse Brian Schertz (not a defendant) at his cell door because he reported a cough. Id. at ¶55. The plaintiff was alert and oriented, and was in no acute distress. Id. at ¶56. He reported an occasional cough, and concern about COVID-19. Id. He denied fever, shortness of breath, chest congestion, nausea, vomiting or diarrhea. Id. The plaintiff's heart and lungs were assessed during this visit. Id. at ¶57. Schertz noted an occasional, non-productive cough, which is a cough without sputum. Id. The plaintiff's vital signs and oxygen levels were normal, his heart rhythm was regular, his respiration was unlabored and regular, his breath sounds were clear. Id. The plaintiff's nail beds were pink, and his capillary refill was less than two seconds, which means he had healthy, oxygenated blood flow. Id. Schertz encouraged the plaintiff to take cough syrup as prescribed, which he had in his cell. Id. at ¶58. The plaintiff was encouraged to increase oral fluids and rest, and was advised to let HSU know if his symptoms persisted or worsened. Id.

The plaintiff was regularly screened for COVID-19 after that and did not report a cough or any other symptoms. Id. at ¶59.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477

U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendants contend that the evidence shows they responded to an outbreak of COVID-19 in October 2020, not with deliberate indifference, but with thoughtful regard for the health and safety of persons in their care. Dkt. No. 41 at 2. They also contend that they were not deliberately indifferent because there is no evidence that the plaintiff suffered any injury or harm. Id. at 6-9. The defendants contend that defendant Hepp cannot be liable because Waupun's COVID-19 mitigation strategy to isolate/quarantine in place was reasonable under the circumstances. Id. at 9-15. They assert that defendants Alsum, Falke and York must be dismissed because they had no personal involvement in the events at issue in the lawsuit. Id. at 15-17. Finally, they contend that they are entitled to qualified immunity. Id. at 17-19.

11

Case 2:21-cv-00232-PP   Filed 04/29/24   Page 11 of 19   Document 54

The plaintiff responds that the defendants showed deliberate indifference because they refused to transfer him out of his cell and provide him with cleaning supplies when his cellmate tested positive for COVID-19, even after the plaintiff explained that he had a compromised immune system. Dkt. No. 49 at 2-3. He asserts that he did not have to actually suffer injury or harm for the defendants to be deliberately indifferent. Id. at 3-4. The plaintiff contends that Hepp was aware of his medical situation but showed deliberate indifference, that moving him from "the relative safety of RHU to GP showed deliberate indifference" and that Alsum, Falke and York were deliberately indifferent. Id. at 8-11. The plaintiff argues that the defendants are not entitled to qualified immunity. Id. at 11-14.

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To demonstrate a violation of the Eighth Amendment, an incarcerated individual must make two showings. "First, the deprivation alleged must be, objectively, sufficiently serious." Id. at 824 (quotations omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. The second requirement is that the prison official was deliberately indifferent "to inmate health or safety," id., meaning that he was both aware of and disregarded "an excessive risk to inmate health or safety," id. at 837.

The defendants do not assert that the plaintiff has not satisfied the objective element of an Eighth Amendment claim and they acknowledge that the plaintiff was at a high risk for developing a serious illness due to his splenectomy. Dkt. No. 41 at 6. The court assumes for the purpose of summary judgment that the plaintiff has satisfied the objective standard of an Eighth Amendment claim based on his condition and the risk of serious harm for contracting the virus. See Wilson v. Williams, 961 F.3d 829, 840 (6th Cir. 2020) (finding that the transmissibility of COVID-19 combined with a prison's dormitory-style housing presented a substantial risk that incarcerated individuals "will be infected with COVID-19 and have serious health effects as a result"); see also Ducksworth v. Utter, Case No. 21-cv-197, 2022 WL 3647884, at *4 (E.D. Wis. Aug. 24, 2022); Stewart v. Haese, Case No. 20-cv-1494, 2022 WL 1750523, at *2-3 (E.D. Wis. May 31, 2022).

According to the plaintiff, he did not suffer any injury as a result of being confined in the cell with Mr. Bullock, including testing positive for COVID-19. He contends, however, that he does not need to suffer an injury because "[a] prisoner may state 'a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, exposed him to [environmental conditions] that pose an unreasonable risk of serious damage to his future health.'" Dkt. No. 49 at 4.

An incarcerated individual may state "a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, exposed him to [environmental conditions] that pose an unreasonable risk of serious damages to his future health," such as exposure to environmental toxins, to which contemporary society would not expose any unwilling individual. Helling v McKinney, 509 U.S. 25, 35-36 (1993) (establishing a two-

13

prong test to determine whether exposure to second-hand tobacco smoke violates a prisoner's Eighth Amendment rights). To state an Eighth Amendment claim based on future injuries, the plaintiff must allege "that he himself is being exposed to [an objectively serious condition]" and "that prison officials were deliberately indifferent to his plight[.]" Lehn v. Holmes, 364 F.3d 862, 872 (7th Cir. 2004) (quoting Helling, 509 U.S. at 35-36). It is undisputed that the plaintiff did not suffer any injury from being housed with Mr. Bullock, and he does not claim that he is at risk of suffering a future injury based on being confined in a cell with Mr. Bullock from October 25 to October 27, 2020. The plaintiff no longer is confined in a cell with an individual who tested positive for COVID-19 and he does not claim that he will be. The plaintiff has not established a claim based on a future injury. See id.; see also Helling, 509 U.S. at 35-36.

Being exposed to a mere risk of harm, without actually incurring harm, is not enough to maintain an Eighth Amendment claim. Lord v. Beahm, 952 F.3d 902, 905 (7th Cir. 2020) ("risk is not compensable without evidence of injury"); Henry v. Deshler, Case No. 20-2185, 2021 WL 2838400, at *2 (7th Cir. July 8, 2021) ("unless a prisoner is challenging a failure to protect him from a serious risk of future harm, a claim of deliberate indifference cannot be based on a risk that never came to pass"); see also Barnes v. Carr, Case No. 21-CV-51, 2021 WL 3662452, at *2 (W.D. Wis. Aug. 18, 2021) (incarcerated person's allegation that defendants subjected him to conditions making it likely that he would be exposed to the coronavirus failed to state a claim for damages because he did not allege that he contracted COVID-19 or was otherwise harmed); see also Lee v. Chak, Case No. 22-cv-119, 2022 WL 1451666, at *2 (W.D. Wis. May 9, 2022) (plaintiff's claim that he shared a cell with a COVID-

14

positive cellmate but who did not allege he contracted the coronavirus, or suffered any other form of injury, not compensable—if a plaintiff "want[s] to recover money damages solely for the risk to his life," to which he alleges defendants were deliberately indifferent, "[t]hat risk is not compensable without evidence of injury.").

Even if the plaintiff had suffered an injury, a reasonable factfinder could not conclude that any defendant acted with deliberate indifference. In assessing the subjective prong of an Eighth Amendment claim, the question is whether the defendants "responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. The Court of Appeals for the Seventh Circuit has directed district courts to review the "totality of the facts and circumstances" when evaluating the reasonableness of prison officials' responses to the pandemic. Mays v. Dart, 974 F.3d 810, 819-20 (7th Cir. 2020). District courts should not consider the response to the pandemic "in a vacuum." Id. at 820. "[W]hen evaluating reasonableness . . . courts must afford prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. (quoting Henry v. Hulett, 969 F.3d 769, 783 (7th Cir. 2020)). "Correctional administrators must have 'substantial discretion to devise reasonable solutions to the problem they face,' particularly when safety and security interests are at stake.'" Id. (quoting Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318, 326 (2012)).

It is undisputed that Waupun had a variety of practices and protocols in place to try to slow the spread of COVID-19, including isolating or quarantining incarcerated individuals when space was available. In October 2020, due to an

15

Case 2:21-cv-00232-PP   Filed 04/29/24   Page 15 of 19   Document 54

increase in COVID-19 cases at Waupun, Warden Hepp notified incarcerated individuals of the increase, the need to modify activities and that COVID-19 testing would be conducted. The WING testing took place at Waupun on October 20 and 23, 2020. The results showed 431 incarcerated persons tested positive for COVID-19, which was more than Waupun could individually isolate. Negative incarcerated individuals had been living with positive individuals in the days between testing and receiving test results back. Waupun was unable to move negative incarcerated persons and cell them together because they could have been exposed to the virus already. Waupun also had to consider the possibility that any given individual may have falsely tested negative or positive due to the limited accuracy of the tests. In response to the positive cases, Waupun continued with modified operations and scheduled more testing for November 2020.

On October 14, 2020, a day after Hepp sent his memorandum, the plaintiff was transferred from TLU back to general population and into a cell with Mr. Bullock.[4] On October 25, 2020, Nurse York informed Mr. Bullock that he had tested positive for COVID-19. The plaintiff requested that he or Mr. Bullock be moved from the cell and he told York about his underlying condition, but she said she wouldn't move him because he had already been exposed. She allegedly refused his request for cleaning supplies for the same reason.

---

[4] The plaintiff claims that the defendants acted with deliberate indifference because he was moved out of TLU and into the general population on October 14, 2020. At screening, the court did not allow the plaintiff to proceed on a claim based on these allegations. In any event, the plaintiff does not allege that Mr. Bullock had tested positive for COVID-19 when the plaintiff moved into the cell nor does the plaintiff allege that he asked to be moved from the cell until after Mr. Bullock tested positive. The plaintiff has not stated an Eighth Amendment claim based on the transfer from TLU to the general population.

16

The court does not second-guess Waupun's decision to continue to house together two incarcerated individuals, one who tested positive and one who tested negative. See Mays, 974 F.3d at 820-21 (7th Cir. 2020) (quoting Henry v. Hulett, 969 F.3d 769, 783 (7th Cir. 2020) (*en banc*) ("When evaluating reasonableness, . . . courts must afford prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"); see also Bell v. Wolfish, 441 U.S. 520 (1979). York's response was consistent with Waupun's modified policy based on the recent increase in positive cases and she did not act with deliberate indifference by following the policy. Waupun did not have the space to isolate individuals who had tested positive, and it was reasonable to assume that the plaintiff already had been exposed to the virus because he shared a cell with Mr. Bullock. See Stewart v. Haese, Case No. 20-cv-1494, 2022 WL 1750523, at *4 (E.D. Wis. May 31, 2022) (refusing to move incarcerated individual from cell after cellmate tested did not rise to the level of deliberate indifference because institution had several measures in place to prevent the spread of COVID, given outbreak, removing COVID positive individuals from their cells was no longer feasible, in order to prevent the spread even further, a policy was enacted where COVID positive individuals were told to quarantine in place, and the decision was made to have exposed cellmates remain in the cell too).

Defendant York followed policy when she told the plaintiff that he would not be moved because he already had been exposed. The fact that the plaintiff had a compromised immune system did not change the fact that he had been exposed to the virus. The record reflects that the plaintiff submitted multiple requests to be moved and that he received responses to some of his requests.

17

Two days after learning that his cellmate had tested positive, the plaintiff spoke with a nurse who said he would email his supervisor, defendant Weinman, about the plaintiff's situation. That day, the plaintiff was moved.

A reasonable factfinder could not conclude that the defendants violated the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment. Because the court has dismissed the plaintiff's claims on the merits, it need not address the defendants' contention that they are entitled to qualified immunity.

### III. Conclusion

The court **GRANTS** defendants' motion for summary judgment. Dkt. No. 33.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the

full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of April, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**